UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAREN MALONE,

                    Plaintiff,                                Hon. Robert Holmes Bell

v.                                               Case No. 1:13-CV-821

COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.

_____/

## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.  Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

2

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## **PROCEDURAL POSTURE**

Plaintiff was 36 years of age on her alleged disability onset date.  (Tr. 121).  She successfully completed high school and worked previously as a school bus driver, resident aide, receptionist, and customer service representative.  (Tr. 19, 32).

Plaintiff applied for benefits on May 27, 2010, alleging that she had been disabled since July 28, 2009, due to multiple sclerosis, fatigue, tremors, difficulty concentrating, weakness, lightheadedness, wooziness, unsteadiness, loss of balance, sensation of spinning, and confusion.  (Tr. 121-22, 158).  Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 65-119).  On January 13, 2012, Plaintiff appeared before ALJ James Prothro, with testimony being offered by Plaintiff and a vocational expert.  (Tr. 25-64).  In a written decision dated February 24, 2012, the ALJ determined that Plaintiff was not disabled.  (Tr. 10-20).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 1-5).  Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL EVIDENCE

On August 7, 2009, Plaintiff was examined by Dr. Herman Sullivan.  (Tr. 230-32).

Plaintiff reported that she was suffering from multiple sclerosis as well as dizziness and numbness

in her lower extremities.  (Tr. 230).  The results of an examination were as follows:

> Motor exam: Normal power in all groups tested.  No fasciculations or atrophy.  Tone is normal.
>
> Sensory: Normal light touch, pin-prick, temperature, vibration, joint position sense, double simultaneous stimulation, graphesthesia and stereognosis.
>
> Coordination: Normal gait, station.  No limb ataxia or dysmetria. Speech is normal.
>
> Reflexes: Symmetric and normoreflexive deep tendon reflexes, flexor plantar responses bilaterally.  No pathological reflexes elicited.

(Tr. 231).

> Dr. Sullivan concluded:
>
> I find no neurological deficits on today's exam.  The patient['s] symptoms at this point in time are all somewhat subjective. However, the reports that I have would be supportive of the diagnosis.  I do not have access to her MRI scan of the brain or spinal cord done 2 ½ years ago which showed the lesions.  She brought in an MRI scan disc for a recent thoracic MRI scan which was normal.

(Tr. 232).

On August 10, 2009, Plaintiff participated in an MRI examination of her brain the

results of which revealed:

> The appearance of the brain has not changed since 9/12/07.  There is a tiny punctate focus of increased FLAIR/T2 signal present within the right pons which has not enlarged, again demonstrating no abnormal enhancement.  This is nonspecific.  Given the patient's history of

4

> multiple sclerosis this likely reflects a small plaque. No additional disease however is seen.

(Tr. 237).

On August 10, 2009. Plaintiff participated in an MRI examination of her cervical spine the results of which revealed:

> Stable MRI of the cervical spine with minimal linear T2 signal brightening stable within the posterior cord as described. No new lesions are seen. There is no enhancement to suggest "active plaque."

(Tr. 235).

On September 15, 2009, Dr. Sullivan reported the following:

> I saw [Plaintiff] in follow up and reviewed with her the results of the MRI scan of the brain and spinal cord. There has been no change. This is quite favorable. I emphasized to her that this is very optimistic that she is not having what we feel to be increased activity in the disease state. Therefore she should continue the immunomodulating drug. She does have some concerns about persistence of her symptoms but unfortunately we have no medication that is going to undo disability that may persist after a lesion.

(Tr. 228).

On December 8, 2009, Plaintiff was examined by Louise O'Donnell. (Tr. 224-26). With respect to her examination and observations, O'Donnell reported as follows:

> On arrival to the office today, Karen appears to be in relatively good health but somewhat subdued spirits. She reports that since her last visit she has gotten no better with her dizziness. She spends the majority of her day in bed. She finds that if she is up and involved in any form of activity she "feels as if I am on a roller coaster" and this is quite unnerving to her and seems to aggravate a bit of nausea. She is continuing to use her Copaxone injections on a daily basis without difficulty. She [unknown][1] run out of Zanaflex. She has stopped

[1] The text in this portion of the report is not readable. (Tr. 225).

> Neurontin and Cymbalta, and instead [unknown][2] using two to three puffs of marijuana twice daily. She finds that this helps with the nausea.
>
> Karen is actually here today because she wants "a release for work," because she and her family need the money. She tells me however, she spends the majority of her day in bed and that she can only be up for an hour or two at a time. When asked how she is going to be able to work with that level of impairment, she says, "I'll just have to do it." Karen also is not eating, since she has some nausea. She is not involved in activities and she is getting no regular exercise. Her mother and her children are providing most of her home care activity.
>
> On assessment today, Karen's blood pressure is 122/74 with a heart rate of 68. Her neurological assessment is relatively normal other than her complaints of feeling unsteady and reports of "numbness" in both legs, although she does have good sensory perception to light touch, pinprick, temperature, vibration and position sense. There is very mild nystagmus with lateral gaze, as noted.

(Tr. 224-25).

On March 1, 2010, Plaintiff was examined by Nurse O'Donnell. (Tr. 220-22). With respect to her examination and observations, O'Donnell reported as follows:

> On arrival to the office today, Karen appears to be in relatively good health but somewhat subdued spirits. She had contacted the office in mid-January telling us she wanted to go back to work and she felt she could do that. Therefore, a release back to work was provided. However, since that time apparently she has only been able to work about two days per week, because of her sense of dizziness. According to her mother, Karen spends the majority of her time in bed. She does not get any regular exercise. She also tells me she is not sleeping and that she "aches all over."
>
> In addition, she tells me that she has had some difficulty with excessive menses that just continues on and on. She has been diagnosed with endometriosis and fibroid tumors and may be having a scope on Thursday. She is continuing to use Zanaflex 4 mg daily at bedtime in hopes of helping her sleep. Tylenol Extra Strength,

---

[2] The text in this portion of the report is not readable. (Tr. 225).

> Neurontin 300mg b.i.d., Lexapro 10 mg daily (she never did increase to 20 mg as instructed) and her Copaxone injections on a daily basis. She also is continuing to use marijuana on a daily basis.
>
> Karen describes her dizziness as a sense of spinning that sometimes will cause nausea and she describes them as present almost all of the time.
>
> On assessment today, Karen's blood pressure is 113/75 with a heart rate of 80. Her neurological assessment is relatively normal with the exception of her quite subdued affect. There is no evidence of weakness, clumsiness nor balance difficulties. Her reflexes appear to be normal.

(Tr. 220-221).

On March 25, 2010, Plaintiff was examined by Nurse O'Donnell. (Tr. 217-18). The results of this examination were as follows:

> On arrival to the office today, Karen appears to be in her usual state of health but somewhat improved spirits. She reports that since her last visit she is back on Cymbalta, using 60 mg daily. This is in addition to her Copaxone injections daily, Zanaflex 4 mg q.h.s. and Neurontin 300 mg b.i.d. She also tells me that since her last visit she has been trying to incorporate exercise into her daily routine. She is up to walking about [unknown][3] minutes four days per week. She is also telling me that she is getting out of the [unknown][4] and out of bed and is actually performing some household duties which is an improvement over her last visit here. She is continuing to struggle with dizziness but starting to acclimatize to it.
>
> Karen tells me that she does have a hysterectomy scheduled for the 13th of April with Dr. Edvenson and that he has requested a "surgical clearance" from our office.
>
> On assessment today, Karen's blood pressure is 188/70 with a heart rate of 79. Her neurological assessment is relatively normal with the

[3] The text in this portion of the report is not readable. (Tr. 218).

[4] The text in this portion of the report is not readable. (Tr. 218).

exception of her somewhat anxious affect.  There is no evidence of nystagmus, hyperreflexia, nor weakness.

(Tr. 217-18).

On May 3, 2010, Plaintiff was examined by Nurse O'Donnell.  (Tr. 214-15).  With respect to her observations and examination, O'Donnell reported as follows:

> On arrival to the office today, Karen appears to be in a bit better health and spirits.  As you know, she did have a hysterectomy done and she seems to be recovering quite nicely from that.  She is continuing to use her Copaxone 20 mg daily in combination with Neurontin 300 mg b.i.d., Zanaflex 4 mg at bedtime, multivitamin and vitamin D supplement (she did discontinue her Cymbalta).  She is trying to get back to some regular exercise but has been going quite slowly since her surgery.  She has worked up to about 20 minutes of walking around the house daily.  She is performing some minor home care activities.  She has not been able to go up and down the steps yet.  She is fearful, since she has fallen down the steps several times due to her dizziness.  She finds that whenever she turns her head or moves through her environment, she has a sense of dizziness which then causes some anxiety and occasionally some nauseousness.  This then affects her cognitive function.  Sometimes she forgets how to spell words or simple answers to very basic questions.  She finds then that she makes it very difficult to perform even basic tasks during the day including tracking simple conversations.
>
> On assessment today, Karen's blood pressure is 139/83 with a heart rate of 78.  Her neurological assessment is relatively normal with the exception of her somewhat subdued affect and reports of dizziness.

(Tr. 214-15).

On August 11, 2010, Plaintiff participated in a consultive examination conducted by Dr. R. Scott Lazzara.  (Tr. 241-47).  With respect to Plaintiff's subjective complaints, the doctor observed as follows:

> She complains of problems with tremors, dizziness, weakness and loss of balance as well as vertigo.  She states that any kind of bending causes increased imbalance as well as any kind of vibration or

climbing stairs.  She did undergo physical therapy three months ago but is not undergoing any therapy now.  She does not use an assistive device but does have a tendency to hold onto furniture and walls.

The patient states that she has not worked since July 2009.  She used to work at Fifth Third Bank at the bank call center and tried to return to work in March 2010 but states that she was not able to handle the long days because of the vibration and vertigo.  She now lives with her mother and children in a house.  She can do her activities of daily living slowly.  She is able to drive and cook on occasion.  She does do some light laundry and picking up around the house.  She does not do any heavy cleaning.  She used to enjoy going to music parks and watching movies but again cannot handle the motion.  She used to enjoy dancing and skating.  She can sit and stand for about 30 minutes and can walk for about 30 minutes.  She can lift about 10 pounds.

(Tr. 243).  The results of a musculoskeletal examination were as follows:

There is no evidence of joint laxity, crepitance, or effusion.  Grip strength remains intact.  Dexterity is unimpaired.  The patient could pick up a coin, button clothing, and open a door.  The patient had mild difficulty getting on and off the examination table, mild difficulty walking on heels, was unable to walk on toes, moderate difficulty partially squatting, and was unable to hop.  Straight leg raising is negative.  There is no paravertebral muscle spasm.

(Tr. 244).  A neurological examination revealed the following:

Cranial nerves are intact.  Motor strength and tone are normal.  Sensory is intact to light touch and pinprick.  Rapid alternating movements were slow.  She was unable to tandem walk.  She had diminished ability to toe tap.  Reflexes in the lower extremities are 2+ and symmetrical.  Romberg testing[5] is negative and had truncal ataxia (sic).  The patient walks with a wide based gait without the use of an assist device.

(Tr. 246).

---

[5]  Romberg test is a neurological test designed to detect poor balance.  *See* Romberg Test, available at http://www.mult-sclerosis.org/RombergTest.html (last visited on August 19, 2014).  The patient stands with her feet together and eyes closed.  The examiner will then push her slightly to determine whether she is able to compensate and regain her posture.  *Id.*

Dr. Lazzara diagnosed Plaintiff with multiple sclerosis and concluded as follows:

> She did have truncal ataxia today.[6]  She was somewhat slow with
> rapid alternating movements.  She did have diminished toe tapping.
> She was unable to tandem walk.  She does compensate with a small
> stepped wide based gait and an assistive device would be helpful on
> uneven ground.  She does appear to have chronic progressive disease
> clinically and is on Copaxone.  Unfortunately, her long term
> prognosis does appear guarded due to her age and already into a
> chronic progressive disease state.  She continues to try and stay
> active.

(Tr. 247).

On August 19, 2010, Plaintiff participated in a consultive examination conducted by

Cynthia Raven, LLP.  (Tr. 249-53).  With respect to Plaintiff's subjective complaints and symptoms,

Raven reported the following:

> The patient is a 37 year old female who complains that she has been
> feeling "down" since 2004.  She admits to feeling hopeless and
> helpless but not worthless.  She has difficulty focusing and
> concentrating "all the time."  She is not easily irritated and when
> angry she will cry.  She tends to isolate but states, "I do it because I'm
> so dizzy and it's better if I sit in a dark room."  She sleeps between 4
> to 5 hours at night with a 3 hour nap during the day.  She eats 1 to 2
> meals a day and has lost 40 pounds in the last 6 months.  She
> complains that she feels weak and dizzy and has been falling "all of
> the time."  She adds, "It's worse if I'm on an escalator, riding in the
> car, on a stairway, or bending over."  She complains that her body is
> very stiff in the morning and that it may take her 2 hours before she
> may move more freely.  She adds, "It starts to stiffen again in the
> evening."  She was diagnosed with Multiple Sclerosis in February,
> 2007 and attributes her symptoms to this illness.  She has had
> difficulty walking and standing due to numbness in her toes.  She
> experiences numbness in the femur area of her left leg and paralysis
> in her right arm at times.  She states, "It's embarrassing sometimes to

---

[6]  Ataxia refers to "the abnormal movements seen in coordination disorders."  *See* Coordination and Gait, available at http://www.neuroexam.com/neuroexam/content.php?p=35 (last visited on August 19, 2014). Truncal ataxia "affects the proximal musculature, especially that involved in gait stability, and is caused by midline damage to the cerebellar vermis and associated pathways."  *Id.*

10

go out.  When the symptoms are bad, I feel like I'm drunk."  She was
last employed in July, 2010.

(Tr. 249).

With respect to Plaintiff's activities, Raven reported the following:

The patient arises at 8:00 AM and will sit with her mother.  She
states, "Mom goes to church every day and I talk to her when she gets
ready.  The patient may sit on the porch to talk to and supervise her
children.  She may take a nap at noon and sleep for 2 to 3 hours.  She
does her grocery shopping on line and has someone pick them up for
her.  She rarely cooks because she drops pans and bumps into the
stove.  Her mother and children do many of the household chores.
She attends Our Lady of Sorrow Church every Sunday and a prayer
service on Friday evening.  She may go to bed between 8:00 and
midnight.

(Tr. 250).

With respect to Plaintiff's "attitude/behavior," Raven observed as follows:

The patient was in contact with reality.  She was cooperative and
polite.  She tended to joke about her condition at times but when
discussing her lack of ability to function she was tearful and sad
looking.  She states, "I make a joke if I drop something. If you're not
laughing, you're crying." Her hands trembled and she had a tendency
to keep her hands at her sides.  She rates her past self-esteem as a 10
on a scale from 1 to 10.  She admits that she was confident and self
assured.  She rates her current self-esteem as a 5 and adds, "I feel like
I'm 80."

(Tr. 251).

As for Plaintiff's "emotional reaction," Raven observed the following:

The patient's affect appeared depressed at times.  She tended to mask
her depressive symptoms by joking and smiling.  She was tearful on
occasion and apologized when she cried.   She appeared anxious
during the mental capacity section of this exam stating, "I freeze up
under pressure."  Her greatest fear is that she may reach a point in her
illness when she can no longer care for herself.  She handles her anger

11

as previously indicated.  She admits that she has become more withdrawn over the last few years.

(Tr. 251).

Raven diagnosed Plaintiff with depressive disorder and concluded that "the potential for the patient becoming gainfully employed in a simple, unskilled work situation on a sustained and competitive basis is guarded pending psychiatric treatment for symptoms of depression and anxiety." (Tr. 252).

Following a May 6, 2011 examination, Louise O'Donnell reported that Plaintiff's "neurological assessment is relatively normal with the exception of her somewhat subdued affect and reports of dizziness," but that "there is no evidence of weakness, imbalance nor nystagmus."  (Tr. 313).

On August 22, 2011, Plaintiff was examined by Louise O'Donnell.  (Tr. 317-18).  The results of an examination were as follows:

On assessment today, Karen's blood pressure is 109/58 with a heart rate of 95.  Her neurological exam continues to show symptoms of anxiety.  She does report intermittent dizziness although there is no evidence of weakness, imbalance or nystagmus.

(Tr. 317).

On October 5, 2011, Plaintiff was examined by Louise O'Donnell.  (Tr. 322-23).  An examination revealed the following:

On assessment today, Karen's blood pressure is 109/63 with a heart rate of 81.  Her neurological assessment is relatively normal with the exception of her continued symptoms of anxiety and mild generalized weakness throughout.  There is no evidence of imbalance nor nystagmus and reflexes are normal.

(Tr. 322).

On October 19, 2011, Plaintiff participated in an MRI examination of her brain the results of which revealed:

1. Findings compatible with multiple sclerosis as described above. However no active/acute foci of demyelination are noted on the MRI examination.

2. Otherwise no findings to suggest acute intracranial process.

(Tr. 326).

On October 19, 2011, Plaintiff participated in an MRI examination of her cervical spine the results of which revealed "[a]bnormal signal" and, moreover, that "[d]emyelination[7] is likely." (Tr. 327).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[8] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§

---

[7] Demyelination is the "destructive removal of myelin, an insulating and protective fatty protein which sheaths nerve cells (neurons)." *See* Demyelination, available at http://www.mult-sclerosis.org/demyelination.html (last visited on August 19, 2014).

[8] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

404.1520(a), 416.920(a).  The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy.  *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.  While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from (1) multiple sclerosis; (2) status post hysterectomy; (3) history of obesity; (4) depression; and (5) marijuana use, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 12-15).  With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform sedentary work subject to the following limitations: (1) she can lift less than 10 pounds; (2) she can stand and walk four hours during an 8-hour workday; (3) she can sit for six hours during an 8-hour workday; (4) she can

occasionally bend, stoop, and squat; (5) she requires the use of a walking aide when ambulating on uneven ground; and (6) she is limited to simple, unskilled work.  (Tr. 15).

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding.  *See Richardson*, 735 F.2d at 964.  While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added).  This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy.  *See Richardson*, 735 F.2d at 964.  Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, her limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert James Lozer.

The vocational expert testified that there existed approximately 7,400 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding.  (Tr. 55-56).  This represents a significant number of jobs.  *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006).  The ALJ concluded, therefore, that Plaintiff was not entitled to disability benefits.

15

I.          **The ALJ's RFC Determination is not Supported by Substantial Evidence**

As noted above, the ALJ concluded that Plaintiff retains the ability to perform sedentary work subject to certain exertional and non-exertional limitations.  Plaintiff argues that the ALJ's RFC fails to sufficiently account for her emotional impairments and the limitations imposed by such.  The Court agrees.

As part of Plaintiff's claim for benefits, William Schirado, Ph.D. performed a review of Plaintiff's medical records.  (Tr. 18, 72-74).  Dr. Schirado reported that Plaintiff experienced "sustained concentration and persistence limitations."  (Tr. 72).  Specifically, the doctor concluded that Plaintiff was "moderately limited" in her ability to "maintain attention and concentration for extended periods" and "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  (Tr. 72-73).  The doctor further concluded that Plaintiff was "moderately limited" with respect to her ability to "interact appropriately with the general public" and "respond appropriately to changes in the work setting."  (Tr. 73).

Finding that Dr. Schirado's opinions were "consistent with the objective record," the ALJ afforded "great weight" to such.  (Tr. 18).  The Court agrees that Dr. Schirado's opinions are consistent with the record.  Nevertheless, despite affording "great weight" to the doctor's opinions, the ALJ's RFC determination fails to incorporate or reflect such.  More to the point, the ALJ's RFC determination does not sufficiently account for the limitations imposed by Plaintiff's emotional impairments.  The only non-exertional limitation recognized by the ALJ in his RFC determination is that Plaintiff is limited to "simple, unskilled work."  (Tr. 15).  While such a limitation is often sufficient to account for a claimant's non-exertional limitations, such is not the case in this instance.

16

Simply stated, limiting Plaintiff to simple, unskilled work fails to address or account for the limitations she experiences in the various areas identified by Dr. Schirado and which are amply supported by the medical record.

In sum, as the evidence detailed above makes clear, and as the ALJ recognized by affording great weight to Dr. Schirado's opinion, Plaintiff 's ability to perform work activities is impaired to an extent greater than that recognized by the ALJ. Accordingly, the Court concludes that the ALJ's RFC determination is not supported by substantial evidence.

## II.        Remand is Appropriate

The ALJ's conclusion that Plaintiff is not disabled was based on the vocational expert's testimony that there existed a significant number of jobs which Plaintiff could perform consistent with the ALJ's RFC determination. As discussed above, however, the ALJ's RFC is not supported by substantial evidence and because the vocational expert's testimony was premised upon a faulty RFC determination, the ALJ's reliance thereon does not constitute substantial evidence. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996) (while the ALJ may rely upon responses to hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments).

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling). While the ALJ's decision is not supported by substantial

evidence, there does not exist *compelling* evidence that Plaintiff is disabled.  In sum, evaluation of Plaintiff's claim requires the resolution of factual disputes which this Court is neither authorized nor competent to undertake in the first instance.  The undersigned recommends, therefore, that the Commissioner's decision be reversed and this matter remanded for further factual findings.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision is not supported by substantial evidence.  Accordingly, it is recommended that the Commissioner's decision be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within such time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  August 29, 2014                              /s/ Ellen S. Carmody
                                                ELLEN S. CARMODY
                                                United States Magistrate Judge

18